**Jack E. ROBINSON, Plaintiff,**

v.

**RANDOM HOUSE, INC. et al., Defendants.**

**No. 93 Civ. 3108 (LAP).**

United States District Court, S.D. New York.

Jan. 18, 1995.

Modification of Order March 26, 1995.

Jack E. Robinson, pro se.

Mark A. Fowler, Satterlee Stephens Burke & Burke, New York City, for defendants.

## MEMORANDUM AND ORDER

PRESKA, District Judge.

Plaintiff, Jack E. Robinson ("Robinson"), has brought this action seeking a declaration that his book, entitled *American Icarus: The Majestic Rise and Tragic Fall of Pan Am* (the "Robinson Book"), does not infringe on the copyright and license rights held by defendants (collectively "Daley") in another book, entitled *American Saga: Juan Trippe and His Pan Am Empire* (the "Daley Book"). Both parties have moved for summary judgment and Daley has moved for a preliminary injunction. Finding that the un-disputed facts demonstrate that the Robinson Book infringes on the Daley Book to an extraordinary degree, Daley's motion for summary judgment is granted, and a permanent injunction shall issue prohibiting further distribution of the Robinson Book.

## BACKGROUND

On February 21, 1980, Random House, Inc. ("Random House") published the Daley Book, a biography of Juan Trippe, the founder of Pan Am Airlines. The copyright in this book, which was duly registered with the U.S. Copyright Office as Registration No. TX 489–231, was effective as of May 29, 1980; the copyright currently is held by Riviera Productions, Ltd. Random House holds licensed distribution rights in the book.

On October 8, 1992, Robinson entered into a contract with McGraw–Hill, Inc. ("McGraw–Hill") for the publication of his manuscript which concerned the growth and eventual decline of Pan Am. On March 29, 1993, however, McGraw–Hill cancelled its contract with Robinson on the ground that it believed that the Robinson Book infringed upon the copyright held in the Daley Book. Robinson responded to the cancellation by filing an action on April 5, 1993 against McGraw–Hill to enforce his publishing contract. Robinson voluntarily dismissed that action, *Robinson v. McGraw–Hill*, 93 Civ. 2162 (LAP), on April 16, 1993. Robinson thereafter sought permission from Daley and Random House to use certain portions of the Daley Book in his own treatment of Pan Am. First Random House, on April 27, 1993, then Daley, on May 2, 1993, refused to permit Robinson to use the amount of material that Robinson took from the Daley Book.

Robinson filed this action seeking a declaration that his manuscript did not infringe on the Daley Book. In his answer, Daley asserted counterclaims alleging that the Robinson manuscript infringed upon his earlier copyrighted work. Both parties moved for summary judgment. Daley did not request an injunction prohibiting publication of the Robinson Book during the motion practice, however, at least in part because of Robinson's representations that no publishing com-

pany would publish his manuscript during the pendency of this litigation. Nevertheless, sometime during the summer of 1994, the Robinson Book was published by another publisher, American Literary Press; the book currently is being marketed by that company. After Daley learned that the Robinson Book had been published, he moved for a preliminary injunction prohibiting further marketing of the Robinson Book.

Robinson admits that "[a]pproximately 25–30 percent of the words and phrases in the Daley Book are used verbatim or through close paraphrasing" in his book. (Robinson's Statement Pursuant to Local Rule 3(g) ¶ 4.) Despite this significant use, Robinson neither uses quotation marks nor directly cites to the Daley Book. Indeed, the only acknowledgment to the Daley Book included in the manuscript version of the Robinson Book was deleted in the published version. In fact, despite the direct use of 25–30 percent of the Daley Book, the Daley Book apparently is never mentioned in the published version of the Robinson Book.

Robinson claims that his book does not infringe upon the Daley Book on two theories: one, he argues that he took no protected material from the Daley Book and, two, even assuming that protected material was taken, he argues that such a taking constituted "fair use" under the copyright laws. Daley, on the other hand, asserts that Robinson copied approximately 735 passages constituting at least 33,000 words from the Daley Book. Such copying, according to Daley, represents unlawful copyright infringement and entitles him to injunctive relief against Robinson and attorney's fees pursuant to 17 U.S.C. §§ 504, 505.

## DISCUSSION

### I. Summary Judgment Standard

Under Rule 56(c), summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. § 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law determines which facts are material to the outcome of a particular litigation. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511; *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. Only when it is apparent, however, that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994).

Because of the factual nature of many aspects of a copyright case, a district court should be especially wary of granting summary judgment in cases alleging copyright infringement. *See Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.) (summary judgment traditionally frowned upon in copyright litigation), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). In cases involving the fair use doctrine in particular, such as the instant case, "[b]e-

cause the fair use question is so highly dependent on the particular facts of each case, courts ... have usually found it appropriate to allow the issue to proceed to trial." *Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1258 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987).

A number of cases in this circuit have demonstrated, however, that summary judgment on the fair use issue is appropriate under some circumstances. Several cases, for example, have upheld the granting of summary judgment in favor of defendant when there has been a finding that no copyrightable material was taken or when a finding of fair use was made as a matter of law. *See, e.g., Wright v. Warner Books,* 953 F.2d 731 (2d Cir.1991) (use of copyrighted material not unfair as a matter of law); *Maxtone–Graham,* 803 F.2d 1253 (same); *Hoehling,* 618 F.2d 972 (summary judgment appropriate when no copyrighted material taken).

Other cases in this circuit have made it clear that a *rejection* of the fair use defense and a subsequent finding in favor of a copyright plaintiff also may be appropriate at the summary judgment stage. In *Rogers v. Koons,* 960 F.2d 301, 307 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992), for example, the Court of Appeals held that summary judgment in favor of plaintiff on the fair use issue was proper when the direct evidence is undisputed, or when the evidence was such that no reasonable jury could differ. *See id.; see also United Feature Syndicate, Inc. v. Koons,* 817 F.Supp. 370 (S.D.N.Y.1993) (granting summary judgment in favor of plaintiff after rejecting fair use defense).

## II. Copyright Infringement

■ To prove a claim of copyright infringement, a plaintiff must show ownership of a valid copyright and unauthorized copying of protected material. *See Arica Institute, Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir.1992); *Rogers,* 960 F.2d at 306. In the instant case, Robinson concedes that Daley[1] is the owner of a valid copyright in the Daley

Book. He also concedes that he copied between 25–30 percent of the Daley Book verbatim or through close paraphrase. (Robinson's Statement Pursuant to Local Rule 3(g) ¶ 4.) Robinson argues, however, that the material he took from the Daley Book was not protected material because (a) it was factual, historical material about the life of Juan Trippe, and (b) that the copied material consisted of only stock scenes or *scenes a faire.* Alternatively, Robinson argues that, even if he took copyrighted material, his taking was excusable under the fair use doctrine.

### A. Robinson Took Protected Material

■ Robinson certainly is correct that historical fact is not copyrightable. *See Wright,* 953 F.2d at 735 ("[A]s a threshold matter, section 102 of the Copyright Act does not extend copyright protection to ideas or facts.") No biographer, for example, holds a monopoly in the story of the subject's life. *See Hoehling,* 618 F.2d at 978 n. 5 (citing cases). Moreover, because the retelling of history necessarily proceeds in a certain chronological order, an author cannot hold a copyright in the sequence of the story's elements. *See Arica,* 970 F.2d at 1075 (chronological narration of events not protected); *Hoehling,* 618 F.2d at 978 ("There cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection." (quoting *Myers v. Mail & Express Co.,* 36 C.O.Bull. 478, 479 (S.D.N.Y.1919) (Hand, J.)).

■ What Robinson fails to recognize, however, is that an author's *expression* of historical facts is protected by the Copyright Act. As the Court of Appeals has opined,

What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments. Thus, the essence of infringement lies not in taking a general theme or in coverage of the reports as

1. As noted above, Riviera productions, Ltd. is the holder of the copyright in the Daley Book; for purposes of this opinion, however, all of the

defendants collectively are referred to as "Daley."

events, but in appropriating the 'particular expression through similarities of treatment, details, scenes, events and characterization.'

*Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95–96 (2d Cir.1977) (quoting *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). This fact/expression dichotomy [2] also applies to cases involving biographies or historical non-fiction. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 96–97 (2d Cir.), *cert. denied*, 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); *Craft v. Kobler*, 667 F.Supp. 120, 123 (S.D.N.Y.1987). Indeed, the *Salinger* case illustrates the rights of a subsequent biographer to use the facts contained in a copyrighted work without appropriating the protected expression of his or her source:

[W]hen dealing with copyrighted expression, a biographer (or any other copier) may frequently have to content himself with reporting only the fact of what his subject did, even if he thereby pens a 'pedestrian' sentence. The copier is not at liberty to avoid 'pedestrian' reportage by appropriating his subject's literary devices. *Salinger*, 811 F.2d at 96–97.

█ It is clear in the instant case that the Robinson Book went far beyond the use of mere facts contained in the Daley Book—the appropriation included Daley's expression. Indeed, no reasonable jury could find otherwise. Even the briefest examination of the side-by-side comparison of the two books demonstrates that Robinson used Daley's "particular expression through similarities of treatment, details, scenes, events and characterization." The following passage are examples of such wholesale appropriation of Daley's expression.

---

Robinson Book
Unfortunately, Postmaster General Brown saw little merit in competitive bidding for foreign airmail contracts—so he later testified before Congress—and still less merit in giving NYRBA the Buenos Aires–Dutch Guiana contract. NYRBA, as Brown saw it, was merely trying to use airmail pay to enter the markets that Pan Am and Trippe had staked out. Whatever the law stated about competitive bidding, Brown had become convinced that the interests of the United States were best served by a single airline operating abroad. And as far as Brown was concerned, he was satisfied with Trippe's.

Robinson Book at 38.

Daley Book
Unfortunately, Postmaster General Brown saw little merit in competitive bidding for foreign airmail contracts—so he later testified before Congress—and still less merit in giving NYRBA the Buenos Aires–Dutch Guiana contract. NYRBA, as Brown saw it, was merely trying to use airmail pay to enter the markets that Pan Am and Trippe had staked out. Whatever the law stated about competitive bidding, Brown had become convinced that the interests of the United States were best served by a single airline operating abroad. And as far as single airlines went, he was satisfied with Trippe's.

Daley Book at 84.

---

But Trippe refused to believe what the maps told him. There must be some tiny island the map makers had overlooked. There just had to be something. So he decided to look in one last place, the logs of the old clipper ships from the 1800s which had traversed the sea under sail, and he asked the librarian to pull the captains' notes out of the dusty archives.

Trippe found he didn't believe the maps. There must be some tiny island the map makers had overlooked. There must be something. There was one further place to look for the island he had to have, the logs of the clipper ships which during the previous century had plied the Pacific under sail and now he approached the information desk and asked to see them. He

**2.** When the expression of an idea is inseparable from the idea itself, however, the expression will not be protected. *See CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61, 68 (2d Cir.1994) (citing *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir.1991) and

*Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir.1971)). Such inseparability does not exist in the instant case—Robinson could have used the facts of Juan Trippe's life without appropriating Daley's word choice and vivid descriptions.

He knew about their existence because, 90 years before, his own family had been in the clipper ship business. The handwritten documents that were given to him were brittle with age, and for a moment he succumbed to the romance and history they embodied. Then he got down to work, searching for the island stepping-stone he sensed just had to be there. Then, in a state of awe and high excitement, he found what he was looking for—mention of Wake Island. It lay approximately halfway between Midway and Guam—exactly where it had to be. It was out there all alone, in the middle of the vast and empty Pacific, a single tiny atoll. But it was there and all of Trippe's dreams suddenly became possible. He would cross the Pacific via Wake Island; an isolated Pacific Atoll which, in effect, was rediscovered in modern times in the Map Room of the New York Public Library by Juan Trippe.

Robinson Book at 47.

knew about them because, ninety years before, his family had been in the clipper business. The handwritten documents that were given to him were brittle with age and even a pragmatist like the big burly Trippe succumbed, for a few minutes, to the romance they seemed to contain. Then he got down to business, searching for the island stepping-stone he sensed must be there. In a state of high excitement he found what he was looking for—mention of Wake Island. It lay approximately halfway between Midway and Guam—exactly where it had to be. It was all alone out there, a single tiny island. But a single island was all he needed. His inchoate dreams hardened. He would cross the Pacific via Wake.

Daley Book at 108.

---

These passages are but two of *hundreds* of similar passages in which Robinson took Daley's expression verbatim or through very close paraphrasing. (Tischfield Aff.Exh. A (side-by-side comparison of the two books).) Robinson's use went far beyond the mere use of factual or historical material—Robinson took Daley's organization, writing style, even punctuation, and passed it off as his own.

The cases cited by Robinson lend no support to his view that his large-scale appropriation of Daley's book related to only unprotected factual material. Robinson cites *Hoehling* for the proposition that the interpretations of historical fact are not protectable expression under the copyright laws. *See Hoehling,* 618 F.2d at 978. This is a correct exposition of the law; factual and historical works properly are given more latitude in this regard. Once again, however, Robinson's book goes far beyond the recounting of fact or the interpretation of historical events and extends to Daley's *expression* of the historical interpretation. As stated by the *Hoehling* court,

> the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain.... *[A]bsent wholesale*

*usurpation of another's expression,* claims of copyright infringement where works of history are at issue are rarely successful. *Hoehling,* 618 F.2d at 974 (emphasis added). The instant case is just such an example of "wholesale usurpation of another's expression." Indeed, *Hoehling* noted that a "verbatim reproduction of another work ... even in the realm of nonfiction, is actionable as copyright infringement." *Id.* at 980; *see also Wright v. Warner Books, Inc.,* 953 F.2d 731, 736 (2d Cir.1991) (finding taking of expression in use of only fourteen passages of one to three sentences long).

Robinson also cites *Rosemont Enterprises, Inc. v. Random House,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), for the proposition that heavy reliance on copyrighted material is not necessarily copyright infringement. Once again, however, Robinson does not recognize the difference between ideas and facts, on the one hand, and the author's expression of those ideas and facts on the other. In *Rosemont,* for example, only two direct quotations and one eight-line paraphrase were taken from the copyrighted work. *See id.* Here, Robinson admits that he directly appropriated 25–30% of the Daley

Book including hundreds of passages of Daley's expression. In sum, Robinson's argument that he took only unprotected factual material is wholly without merit.

 Robinson's argument that the material he took from Daley's book constituted only unprotected *scenes a faire* is equally without merit. As the Court of Appeals has explained, *scenes a faire* are incidents, characters or settings that are standard or indispensable in the treatment of a given topic. *See Hoehling,* 618 F.2d at 979. Because writing about a particular historical era is impossible without the use of certain "stock scenes" or literary devices, *scenes a faire* are not copyrightable as a matter of law. *See id.; Novak v. National Broadcasting Co.,* 716 F.Supp. 745, 751 (S.D.N.Y.1989).

 The similarities between the two books in the instant case, however, are much more extensive than simply the common use of certain scenes, locations, phrases or characters. Robinson admits copying 25–30 percent of the Daley Book verbatim or through close paraphrase; hundreds of passages were taken wholesale from the earlier work. These appropriations copied far more than mere stock scenes or common characters or settings but rather took Daley's word choice, descriptions, arrangements and expression of the facts that comprise the story of Juan Trippe's life. Indeed, given that a significant portion [3] of the Robinson Book is taken directly from the Daley Book, Robinson's argument that he took only stock scenes and characters is impossible to accept.

Because Robinson's use of excerpts from the Daley Book included use of Daley's expression rather than merely recitation of factual or historical material, and because the appropriated material constituted far more than mere *scenes a faire,* Robinson copied protected material from the Daley Book. Unless the fair use doctrine applies to these appropriations, Robinson infringed upon the

Daley Book. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 548, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985) (no dispute that verbatim copying constitutes infringement unless fair use applies); *Wright v. Warner Books, Inc.,* 953 F.2d 731, 736 (2d Cir.1991) (same).

## B. Robinson's Use Was Not Fair Use

 The fair use doctrine, codified at 17 U.S.C. § 107, provides an affirmative defense to claims of copyright infringement. This doctrine recognizes that there are circumstances in which the Copyright Act's goals of encouraging creative and original work is better served by allowing a use of copyrighted work than prohibiting such use. *See Arica,* 970 F.2d at 1077. The consent of the author of a copyrighted work is implied as to reasonable uses of the copyrighted work "since a prohibition of such use would inhibit subsequent writers from attempting to improve upon prior works and thus ... frustrate the very ends sought to be attained" by the copyright laws. *Harper & Row,* 471 U.S. at 549, 105 S.Ct. at 2224. In essence, therefore, the fair use inquiry is whether a reasonable author would consent to the use. *See id.* at 550, 105 S.Ct. at 2225. The alleged infringer carries the burden of proof to show fair use. *See American Geophysical Union v. Texaco, Inc.,* 37 F.3d 881, 886 (2d Cir.1994), *modified by,* (2d Cir. Dec. 23, 1994).

 Section 107 enumerates four nonexclusive factors that a district court should weigh in deciding the fair use issue. Those factors are (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use on the potential market for, or value of, the copyrighted work. *See* 17 U.S.C. § 107; *Arica,* 970 F.2d at 1077. The doctrine is an

**3.** Nine of the fourteen chapters contained in the Robinson Book are comprised largely of Daley's expression. Daley asserts that at least 33,000 words of Robinson's 100,000 word book come directly from the Daley Book. After examining the side-by-side analysis, I note that such a figure appears accurate, even conservative. Such a figure would also be consistent with Robinson's own figures: he admits taking 25–30 percent from a Daley Book that contained over 100,000 words. Moreover, the exact word count is irrelevant—even lacking exact figures, no reasonable jury could find that Robinson's appropriation was insignificant, or, as will be discussed below, constituted fair use.

equitable rule of reason and each case must be decided on its own facts. *See Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230.

### 1. The Purpose and Character of the Use

The first factor in the fair use analysis examines "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This factor "asks whether the original was copied in good faith to benefit the public or primarily for the commercial interests of the infringer." *Rogers v. Koons*, 960 F.2d at 309.

Uses of a copyrighted work for purposes such as "criticism, comment, news reporting, teaching ..., scholarship, or research" are given more latitude than uses for commercial purposes. 17 U.S.C. § 107; *see Twin Peaks Productions v. Publications International, Ltd.*, 996 F.2d 1366, 1375 (2d Cir.1993). Indeed, so-called presumptions aptly illustrate the importance of this distinction between the enumerated favored uses and commercial uses: if a use fits within one of the favored uses, the use is considered presumptively fair, *see Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir.1991); if, on the other hand, the use is commercial, there is a presumption that the use is unfair. *See Rogers v. Koons*, 960 F.2d at 309 (citing *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)). Despite these "presumptions," the first factor should not be decided in an all-or-nothing fashion based merely on how one labels the use. The caselaw has recognized that the character and nature of the use is often a matter of degree—a use may fit within one of the favored uses, or be for a commercial purpose, to an insignificant or substantial degree. *See, e.g., American Geophysical Union*, No. 93–9341, Slip Op. at 7951(c) (2d Cir. Dec. 23, 1994) (noting that the Supreme Court recently has abandoned "presumption" language in favor of a more subtle approach), *modifying*, 37 F.3d 881 (2d Cir.1994); *Twin Peaks*, 996 F.2d at 1374 (favored uses matter of degree); *Maxtone–Graham*, 803 F.2d at 1262 (commercial use matter of degree). Indeed, because nearly all authors hope to make a profit with their work, courts should be wary of placing too much emphasis on the commercial nature in a fair use determination. *See American Geophysical Union*, 37 F.3d at 889; *Twin Peaks*, 996 F.2d at 1374.

In the instant case, the Robinson Book was written, at least in part, in order to make a profit. It is also, however, a work of nonfiction about an intriguing man and the airline he founded. The book, which follows the life of Juan Trippe over many decades, certainly would be of interest to students of twentieth century American history. If the analysis stopped at this point, examining only the favored use/commercial use spectrum, factor one would favor neither party, or maybe would even slightly favor Robinson.

Recent cases, however, have made it clear that the factor one analysis also must involve some qualitative measure of the value generated by the secondary use of the copyrighted material and the manner in which it is used. *See American Geophysical Union*, 37 F.3d at 891. As the Supreme Court recently has stated,

> The central purpose of this investigation is to see ... whether the new work merely 'supersede[s] the objects' of the original creation ... or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; *it asks, in other words, whether and to what extent the new work is "transformative...."* [T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell v. Acuff–Rose Music, Inc.*, —— U.S. ——, ——, 114 S.Ct. 1164, 1171, 127 L.Ed.2d 500 (1994) (emphasis added) (citations omitted).

In the instant case, no reasonable jury could find that Robinson's use of the material from the Daley Book was transformative to any substantial degree. Robinson took a significant portion of Daley's book verbatim or through very close paraphrase and added only an introductory chapter and three short concluding chapters. Robinson adds little to

Daley's expression in the nine chapters between these additions—paragraph after paragraph simply is lifted directly from the Daley Book with material added, if at all, merely to create effective transitions to the next Daley passage. (Tischfield Aff.Exh. A.) In essence, Robinson did nothing more than update a shortened version of Daley's book and pass it off as his own. When the secondary use involves such an untransformed duplication of the original, it has little or no value that does not exist in the original work. *See American Geophysical Union*, 37 F.3d at 891. As the Court of Appeals has opined, "[r]ather than making some contribution of new intellectual value and thereby fostering the advancement of the arts and sciences, an untransformed copy is likely to be used simply for the same purpose as the original, thereby providing limited justification for a finding of fair use." *Id.*

 Two other "factor one" issues militate against a finding of fair use in this case. First, the propriety of the alleged infringer's conduct is relevant to a determination of the character of the subsequent use. *See Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231. In this case, although a significant portion of nine out of fourteen chapters in Robinson's book was taken directly from the Daley Book, Robinson fails to quote the Daley Book, to cite to the Daley Book, or even to acknowledge the Daley Book. This reprehensible conduct places Robinson far closer to the scissor-wielding cut-and-paste plagiarist than to the scholar building on others' past works. Second, confusion between the original and the infringing work is also an issue to consider in the factor one analysis. *See Maxtone–Graham*, 803 F.2d at 1260 (fact that objective reader would not confuse two works favored finding of fair use). In this case, a reader would have absolutely no way of knowing that thousands upon thousands of the words used in the Robinson Book actually were penned by Daley.

In sum, I find that the various issues that make up the factor one analysis strongly disfavor a finding of fair use. Although Robinson's book is a work of nonfiction that was written in part for an historical purpose, other issues far outweigh this point: the

commercial purpose of the book, the fact that the book had little transformative value, Robinson's culpable conduct, and the inevitable confusion between the two works by a reader of the Robinson Book.

### 2. Nature of the Copyrighted Work

 Factor two favors a finding of fair use. The factor two analysis provides additional protection to works that are unpublished or that are creative or fictional. *See Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232 (law recognizes greater need to disseminate factual works than fiction; unpublished nature of work is critical to factor two analysis); *American Geophysical Union*, 37 F.3d at 893 (scope of fair use greater for factual works); *Arica Institute*, 970 F.2d at 1078 (scope of fair use less for unpublished works). The Daley Book is a published work of nonfiction. Although Daley's biography certainly is a work involving creativity, the caselaw is clear that subsequent authors may rely more heavily on works of nonfiction than on works of fiction. *See Maxtone–Graham*, 803 F.2d at 1263.

### 3. Amount and Substantiality of the Portion Used

 The third factor in the fair use analysis is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor involves both a quantitative and a qualitative review of how much of the copyrighted work was used, *see Campbell v. Acuff-Rose Music*, —— U.S. ——, ——, 114 S.Ct. 1164, 1175, 127 L.Ed.2d 500 (1994); *Harper & Row*, 471 U.S. at 565, 105 S.Ct. at 2233, and the amount of permissible copying under this factor will vary depending on the nature of the use. *See Campbell*, —— U.S. at ——, 114 S.Ct. at 1175; *American Geophysical Union*, 37 F.3d at 894. Given the undisputed facts relating to the instant case, from both a quantitative and qualitative perspective, no reasonable jury could find that the amount taken from the Daley Book constituted fair use.

 Quantitatively, Robinson admits that he took between 25–30 percent of the Daley Book verbatim or through close paraphrase,

which, for purposes of the copyright laws, is the same as verbatim copying. (Robinson's Statement Pursuant to Local Rule 3(g) ¶ 4.) Although no given percentage of taking is *per se* unreasonable, *see Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (in case involving propriety of VCR copying for time-shifting purposes, 100% copying deemed fair use), Robinson has cited no case similar to the instant case in which 25 percent or more was deemed fair use. Indeed, there are examples in which far less was found to be unfair. *See, e.g., Harper & Row,* 471 U.S. at 564, 105 S.Ct. at 2233 (taking of 13% found to be unfair); *Salinger v. Random House,* 811 F.2d 90, 98 (2d Cir.1987) (taking of 10% found to be unfair); *Craft v. Kobler,* 667 F.Supp. 120, 129 (S.D.N.Y.1987) (taking of 3% found to be unfair); *cf., e.g., Arica,* 970 F.2d at 1078 (taking of only three passages found to be fair); *Wright,* 953 F.2d at 738 (taking of 1% found to be fair); *Maxtone–Graham,* 803 F.2d at 1263 (taking of 4.3% found to be fair).

Indeed, in the instant case, Robinson has failed to show why the taking of *any* of Daley's expression was reasonable. Although a case could be made as to why certain quotations from Juan Trippe or others could have been taken to further the interests of historical scholarship, in this case, a great majority of the appropriated expression contained not Trippe's words, but rather *Daley's* writing style, organization, and graphic method of storytelling. In short, Robinson has presented no justification as to why he took 25–30 percent of the Daley Book to write a history of Pan Am and its founder—he simply provides no justification why the use of Daley's words was reasonably necessary to tell his story.

Qualitatively, too, the amount that Robinson took from the Daley Book could not be deemed fair use by a reasonable jury. Robinson tells the early history of Pan Am and the life of its founder using, in places almost exclusively, passages taken directly from the Daley Book. Robinson appropriated the essence of the Daley Book, the heart of what made the Daley Book worth reading, albeit in an abridged form. This inescapable finding is supported by a quick look at the amount of the Robinson Book that consists of the appropriated material—nine of the fourteen chapters in the Robinson Book are made up significantly of passages taken directly from the Daley Book. Although Robinson is correct in stating that the third factor looks only at the amount of the *copyrighted* work that was taken, *see Wright,* 953 F.2d at 739 (court should look only to portion of original work taken), he fails to recognize that "the fact that a substantial portion of the *infringing* work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist...." *Harper & Row,* 471 U.S. at 565, 105 S.Ct. at 2233 (emphasis added). Thus, the fact that a significant portion of Robinson's book consists of Daley's expression demonstrates that the amount taken from the Daley Book was qualitatively significant.

### 4. Effect of the Market for the Original Work

The fourth factor, which examines the effect that the infringing work will have on the market for the original work, is the most important of the four enumerated factors of the fair use analysis. *See Harper & Row,* 471 U.S. at 566,[4] 105 S.Ct. at 2233. The fourth factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and wide-spread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the *potential market'* for the original." *Campbell,* —— U.S. at ——, 114 S.Ct. at 1177 (emphasis added) (citations omitted). Harm to both the original work and derivative works must be taken into account. *See Harper & Row,* 471

---

4. Very recently, the Court of Appeals has opined that the Supreme Court has moved away from an approach that favors one factor over another. *See American Geophysical Union,* No. 92–9341, Slip Opinion at 7951(c) (2d Cir. Dec. 23, 1994), *modifying,* 37 F.3d 881 (2d Cir.1994). In this case, the result would not differ whether the fourth factor is considered more important than the others, as stated by previous Supreme Court precedent, or not, as suggested by the Court of Appeals.

U.S. at 568, 105 S.Ct. at 2234. In the instant case, no reasonable jury could find that the harm caused to the Daley work by the Robinson Book is to such a minor extent to favor a finding of fair use.

 When a secondary work is substantially a nontransformative duplication of the original that was made for commercial purposes, there is a presumption or inference of market harm to the original work. *See Campbell,* —— U.S. at ——, 114 S.Ct. at 1177 (explaining *Sony,* 464 U.S. at 451, 104 S.Ct. at 793). As the Supreme Court explained in *Campbell,* a nontransformative duplication of an original work merely serves as a marketplace substitute for the original work. In this case, as discussed above, I found as a matter of law that Robinson's book was substantially a nontransformative duplication of the Daley Book, albeit in a shorter version. Robinson's book, which is little more than an updated abridgement of the Daley Book, in the terms used by the *Campbell* Court, serves as a mere market substitute for the original.

Moreover, even without this presumption, Robinson still would not prevail on the fourth factor. Daley has presented uncontradicted evidence that a version of the Daley Book is currently being marketed in an audio tape version and that Daley has had discussions regarding the use of an updated version of his book in conjunction with a documentary project. (Daley's Statement Pursuant to Local Rule 3(g) ¶¶ 15, 16.) In addition, the fact that the Daley Book currently is out of print is not dispositive—the statute focuses on the *potential* market for the original work. *See Craft v. Kobler,* 667 F.Supp. 120, 129 (S.D.N.Y.1987) (out-of-print status not dispositive). Given the current and potential derivative uses of the Daley Book, with which Robinson's appropriation directly competes,

it is clear that the Robinson Book has an adverse effect on the current and potential markets for the Daley Book. As pointed out by the Court of Appeals, "[i]n the cases where ... the fourth factor ... favor[s] the defendant, the defendant's work filled a market niche that the plaintiff simply had no interest in occupying." *Twin Peaks,* 996 F.2d at 1377. In the instant case, the Robinson Book competes with the Daley Book in market niches that Daley expressly has entered or has expressed an interest in entering.

### 5. Aggregate Analysis of the Fair Use Factors [5]

 To summarize, I find, as a matter of law, that factors one, three and four disfavor a finding of fair use in this case. Although it is true that an alleged infringer need not show that every factor favors him or her, *see Wright,* 953 F.2d at 740, in this case, a finding of fair use would be inappropriate as the important first and vital [6] fourth factor disfavor a determination of fair use. Given the undisputed facts and the obvious extent of wholesale copying in this case, it is clear that no reasonable jury could make a finding of fair use. To deny Daley summary judgment in these circumstances would mean adherence to a *per se* rule prohibiting summary judgment against infringers in cases involving fair use—such a rule does not exist. *See Rogers,* 960 F.2d 301. The fair use doctrine "distinguishes between a true scholar and a chiseler who infringes a work for personal profit." *Wainwright Securities Inc. v. Wall Street Transcript Corporation,* 558 F.2d 91, 94 (2d Cir.1977) (internal quotation omitted). In this case, the undisputed and indisputable facts demonstrate that Robinson is far closer to the latter than he is to the former.

**5.** Although the four enumerated factors are not exclusive, I find no other factors that would favor fair use. The only other factors that would be relevant, if considered, would militate against a finding of fair use. For example, Robinson failed to inform his publisher about this lawsuit or that another publisher had cancelled his contract on the basis of a determination that his book infringed on Daley's Book. If considered, this display of bad faith would militate against a finding of fair use. Because I reject the fair use defense on

the basis of the four enumerated factors, I did not consider this issue in my fair use analysis.

**6.** As discussed above in footnote 2, there is some argument that no factor is more important than any other—I need not decide this issue, however, because Robinson's fair use claim fails whether the fourth factor is considered as a "vital" factor or not.

## C. Remedies

### 1. Injunctive Relief

■ Pursuant to 17 U.S.C. § 502(a), a prevailing copyright holder is entitled to a permanent injunction. The law is unclear, however, as to whether a finding of irreparable injury is necessary to form the basis for a permanent injunction once copyright infringement is shown. *See* 3 *Nimmer on Copyright* § 14.16(B), at 14–19 (1994) (citing *American Metropolitan Enterprises of New York v. Warner Bros. Records, Inc.*, 389 F.2d 903 (2d Cir.1968) (granting injunction without discussion of irreparable harm)); *cf. Encyclopedia Britannica Educational Corporation v. Crooks*, 542 F.Supp. 1156, 1187 (W.D.N.Y.1982) (threat of continuing violations needed for injunctive relief). I need not decide this issue, however, because I find that Daley would suffer irreparable harm without the issuance of a permanent injunction. In this case, Robinson published his manuscript after making representations to Daley and to this Court that his manuscript could not be published during the pendency of this litigation. His representations, along with his subsequent failure to inform his new publisher of this lawsuit, induced Daley to forego the opportunity to seek a preliminary injunction against publication, an injunction the I likely would have granted. Although Robinson's behavior did not violate a court order, it demonstrates more than sufficient bad faith on his part to warrant a finding that Daley would suffer irreparable harm without such an order prohibiting any further use of the infringing work.

A permanent injunction shall issue, therefore, prohibiting Robinson from further printing, publishing, or marketing his book without first obtaining licensing rights from Daley. Further, if such licensing rights are not obtained, Robinson, pursuant to 17 U.S.C. § 503(b), will cause all copies of his infringing book under his or his agents' control to be turned over to Daley or shall have

all copies destroyed and provide proof of such destruction to Daley's reasonable satisfaction. Third, Robinson shall submit a copy of any revision to his book 30 days prior to publishing said revision to the Court and to defendants. I will retain jurisdiction over any applications to enjoin publication of such revision. Finally, Robinson shall give notice of this injunction to American Literary Press, Inc., who has informed me that it will abide by any injunction issued in this matter. Daley shall submit a proposed permanent injunction order with language consistent with this opinion on or before January 24, 1995; Robinson may file any objections thereto on or before January 31, 1995.

### 2. Attorney's Fees

■ Pursuant to 17 U.S.C. § 505, a prevailing party is entitled to an award of costs, including reasonable attorney's fees, at the discretion of the court. In order to further the goal of vibrant enforcement of copyright interests, the standard for awarding attorney's fees is "very favorable for prevailing parties; indeed, 'fees are generally awarded to a prevailing plaintiff.' " [7] *Twin Peaks*, 996 F.2d at 1383 (quoting *N.A.S. Import Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 253 (2d Cir.1992)). A cost and attorney's fee award is particularly appropriate in this case as Robinson was placed on notice that his suit would be meritless before he brought it, and because Robinson's bad faith publishing of his manuscript forced Daley to expend significant additional fees to pursue a preliminary injunction. Daley thus may recover any costs expended prosecuting this matter as defined by 28 U.S.C. § 1920. Daley shall submit an itemized accounting of his attorney's fees in this action, in the form of attorney affidavits along with attached exhibits if necessary, on or before January 30, 1995. Robinson may respond to these submissions, if he wishes, on or before February 14, 1995.

---

7. The standards for an award of fees are very different for prevailing plaintiffs than for prevailing defendants. Prevailing plaintiffs receive awards as a matter of course. *See In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 567 (2d Cir. 1994). Prevailing defendants only receive fees, however, when "plaintiff's suit was brought in bad faith or was a baseless or frivolous action." *Id.* In this declaratory judgment action, although Daley is nominally the defendant, he is the plaintiff as to the prevailing counterclaims and thus he is entitled to the more generous standards relating to attorney fee awards.

## CONCLUSION

The undisputed and indisputable facts in this case show that Robinson copied significant portions of the Daley Book. This copying included the appropriation of copyrighted material and did not constitute fair use under 17 U.S.C. § 107. Daley's motion for summary judgment, therefore, is granted and Robinson's motion for summary judgment is denied. Daley thus is entitled to a permanent injunction against further infringement of his copyright and an award of costs, including attorney's fees reasonably expended in the prosecution of this case.

The parties shall appear, either in person or through counsel, for a pretrial conference on February 15, 1995 at 4:30 to discuss what steps need to be taken to conclude this matter.

SO ORDERED:

### *MODIFICATION OF ORDER*

In my opinion of January 17, 1995, I determined, among other things, that defendants (collectively "Random House") were entitled to an award of attorneys' fees from plaintiff Jack E. Robinson ("Robinson") pursuant to 17 U.S.C. § 505. While discussing the appropriateness of the award, I noted in a footnote that attorneys' fees awards were awarded as a matter of course for plaintiffs but that the standard was higher for prevailing defendants. (Memorandum and Order dated January 17, 1995 at 27 n. 7.) For this proposition, I cited *In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 567 (2d Cir. 1994). As the parties correctly have pointed out, however, the Supreme Court rejected the Court of Appeals' approach of treating plaintiffs and defendants differently in *Fogerty v. Fantasy, Inc.*, — U.S. —, 114 S.Ct. at 1023, 127 L.Ed.2d 455 (1994). That portion of my opinion, therefore, must be reexamined, and hereby is modified by the following.

In *Fogerty*, the Supreme Court held that the legislative history of section 505 did not warrant different treatment of prevailing plaintiffs from that accorded prevailing defendants. *See id.* at —, 114 S.Ct. at 1028. Instead of the double standard previously used ruled that both plaintiffs and defendants who prevailed were to be awarded fees upon the district court's discretion. *See id.* at —, 114 S.Ct. at 1033. The Court cited non-exclusive factors that could be considered in reaching a determination of whether fees should be awarded: the "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at — n. 19, 114 S.Ct. at 1033 n. 19 (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir.1986)). The Court found that these factors could be used in the fee award determination "so long as such factors are faithful to the purpose of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." *Id.*

Applying these factors to the instant case, it is clear that my decision to award fees was wholly appropriate. First, I clearly found that Robinson's lawsuit seeking declaratory judgment was not objectively reasonable: his arguments regarding the fact/expression dichotomy, about *scenes a faire*, and concerning the fair use doctrine were without any merit whatsoever. He argued, for example, that the appropriation of 25–30% of Robert Daley's Book verbatim or through close paraphrase did not take protected expression or that such taking involved only stock scenes or phrases. I found, however, that Robinson's use of the Daley Book went far beyond the mere use of facts and clearly appropriated Daley's expression. Moreover, I also found his fair use argument to be unreasonable, finding that no reasonable jury could find that his appropriation was fair use. Several courts in this district have concluded that a finding of objective unreasonableness is sufficient to support an award of attorneys' fees—bad faith or frivolousness is not required. *See CK Company v. Burger King Corporation*, No. 92 Civ. 1488 (CSH), 1995 WL 29488 at *1 (S.D.N.Y. January 26, 1995); *Screenlife Establishment v. Tower Video*, 868 F.Supp. 47, 52 (S.D.N.Y.1994); *Williams v. Crichton*, No. 93 Civ. 6829 (LMM), 1994 WL 689199 at *1 (S.D.N.Y. Dec. 8, 1994).

I would find an award of fees appropriate in this case even if more than objective unreasonableness was required. As I found, Robinson demonstrated bad faith at several stages in this litigation. First, Robinson failed to use quotation marks, footnotes or citations when using material taken directly from Daley's Book. Indeed, despite the admitted appropriation of 25–30% of Daley's Book, in the published version of Robinson's book he does not appear even to mention the Daley Book. The failure to give a heavily quoted author due credit is called plagiarism; this case is a prime example.

Second, Robinson misled defendants and this Court. At a conference before the Court, Robinson implied that preliminary relief prohibiting him from publishing his book would not be necessary, stating that it would be impossible for him to get the book published during the pendency of this suit. Because of this representation, defendants did not seek preliminary relief. Despite his representation, Robinson's book was published[1] while the cross-motions for summary judgment were *sub judice*. Defendants not only were forced to make a preliminary injunction motion, incurring additional costs, but they also suffered damage from the publishing and marketing of an infringing work.

These egregious actions (or omissions) by Robinson demonstrate bad faith to an extent that fully implicates "considerations of compensation and deterrence." Indeed, the bad faith was serious enough in this case that an award of fees would be appropriate even without a finding of objective unreasonableness. Defendants deserve to be compensated for defending their rights against an action that caused them to incur unnecessary legal fees. An award of fees is also necessary to deter Robinson, who has demonstrated that he is willing to take actions that mislead the public (by passing Daley's words off as his own without any attribution), and his adversary and this Court (by quietly publishing his book during this litigation despite his representations to the effect that he could not do so), from violating the copyright laws

again in the future. A denial of fees would discourage copyright holders from litigating cases, like this one, where the monetary considerations are not particularly significant— such a result would frustrate the purposes of the Copyright Act. *See Fogerty,* —— U.S. at ——, 114 S.Ct. at 1031 ("It is increasingly recognized that the person who forces another to engage counsel to vindicate, or defend, a right should bear the expense of such engagement and not his successful opponent." (quoting A. Weil, *American Copyright Law* 530–31 (1917)). I also have considered the relative financial positions of the parties, and Robinson's *pro se* status and conclude that an award of attorneys fees is appropriate and is necessary to address the considerations of compensation and deterrence.

In sum, because of the objectively unreasonable nature of Robinson's arguments in this case and because of Robinson's demonstrated bad faith, the award of attorneys' fees in my opinion will stand. As mentioned above, however, my January 17, 1995 opinion hereby is modified to include the foregoing discussion of *Fogerty.*

SO ORDERED:

---

1. Robinson's publisher has alleged that Robinson failed to inform them of this suit prior to their publication of the book. (Affidavit of Johnye C. Bradley sworn to on Oct. 20, 1994.) This allegation perhaps sheds light on how Robinson was able to obtain a publisher during this litigation. Although this allegation has never been controverted by Robinson, I do not rely on it in this Order, nor did I rely on it in my original opinion.