Jasen, J.
Many Americans, perplexed by the turmoil of our turbulent era, have sought succor and solace in the fond remembrance of sweeter years gone by. That magical span of time between the two World Wars seems to offer a special attraction and allure. Our informational and entertainment media have focused attention on the writers, artists and musicians who flourished during the second, third and fourth decades of this century. A large number of commercial ventures have been launched with a view towards capturing a piece of the nostalgia market. Nostalgia-oriented pitches are but one segment of the myriad of solicitations conducted by record, book and magazine companies throughout the State and the Nation. Given the massive amount of radio, television, magazine and direct mail advertising, very few citizens are unaware of the kinds of wares that these businesses have to offer. The fallout from one such enterprise is before our court today. Artie Shaw, a band leader and musician of great renown in the 20’s, 30’s and 40’s, brought an action against Time, Incorporated, asserting four causes of action. Shaw claims that Time-Life Records’ "Swing Era” series of recordings invaded his privacy, made unauthorized use of his name, damaged his reputation, and unfairly competed with Shaw’s own phonograph records. The plaintiff’s damages are stated to aggregate $2,000,000. Special Term has denied in all respects defendant’s motion for summary judgment. The Appellate Division, with one Justice dissenting, affirmed the order. Leave to appeal to our court was granted upon a certified *204 question—whether the summary judgment motion was properly denied.
In 1969, Time-Life Records, a division of Time, Incorporated, decided to produce a series of records reflecting the music of the Swing Era. Time-Life Records determined that the essence of swing music could not be recaptured by simply reissuing the old 78 r.p.m. recordings. Instead, it hired a modern orchestra to cut new stereo records, utilizing the same musical arrangements made popular by the actual swing bands. In addition, a few selections were taken from an earlier Capitol Records album made by the Glen Gray Casa Loma Orchestra. A total of 450 different arrangements were included in the "Swing Era Series”. Twenty-five Artie Shaw arrangements were in the series. Three of the Shaw selections had been recorded earlier by the Glen Gray orchestra. The rest were Time-Life re-creations. Aside from the plaintiff’s work, arrangements popularized by such artists as Tommy Dorsey, Count Basie, Glenn Miller and Duke Ellington were among those represented in the series. However, none of the name artists played as much as a single note on the Time-Life recordings.
To promote its albums, Time-Life and its advertising agency conducted a massive advertising campaign. Over 60 different direct mail solicitations and magazine advertisements were utilized in the promotion. In one mailing, nearly 12,000,000 fliers were distributed. Advertisements were placed in newspapers and magazines throughout the country, including Time, Life and Sports Illustrated—the mass circulation publications of Time, Incorporated. The plaintiff cites the advertising copy written for these promotions as the instruments that have caused him damage.
Since the 1930’s Artie Shaw has entered into recording contracts with a number of different recording companies. His primary association, however, has been with RCA Victor records. RCA, mounting the same nostalgia bandwagon, arranged with the Reader’s Digest Record Album Service to issue a four-record set entitled "Swing with Artie Shaw”. The RCA Reader’s Digest package contains original Shaw performances which have been electronically re-recorded to give a stereophonic effect. This series has also been heavily promoted in much the same manner as Time-Life’s. RCA also markets the unaltered Shaw originals, as well as other electronic re-recordings. Thus, the consumer has a variety of different *205 commodities to select from. There are Time-Life’s stereo recreations, the RCA Reader’s Digest stereo re-recordings, and the other RCA originals and re-recordings. Not unexpectedly, the plaintiff, the defendant and the critics claim that there are differences in the quality of these records. Another distinguishing feature, significant at least to the plaintiff, is that Artie Shaw receives royalties on the RCA and RCA Reader’s Digest record sales, but receives nothing from Time-Life.
In order to resolve the issue presented by this appeal, we must parse the plaintiff’s four causes of action and analyze the legal principles upon which the actions are predicated. The first two causes of action are grounded in sections 50 and 51 of the Civil Rights Law. Section 50 prohibits the use of the name, portrait or picture of a living person for purposes of trade or advertising without his prior written permission. Section 51 allows an injured party to seek injunctive relief as well as to obtain monetary compensation for his damages. However, section 51 also creates a limited exception permitting the use of the name or picture of an author, composer or artist in conjunction with artistic productions which have been "sold or disposed of with such name, portrait or picture used in connection therewith”. We conclude that the exception applies in this case and that the defendant was entitled to summary judgment on the plaintiff’s Civil Rights Law causes of action.
Artie Shaw did not hold the copyrights to the musical compositions which he arranged. Those rights were held by others who were duly compensated by Time-Life. Although musical compositions can be afforded copyright protection, arrangements made of those compositions are not copyrightable. Absent a claim of unfair competition, a competitor may appropriate any musical arrangement which is not so distinctive as to constitute a separate musical entity. (Supreme Records v Decca Records, 90 F Supp 904, 908-909.) Artie Shaw does not have any property interest in the Artie Shaw "sound”. So long as there is an absence of palming off or confusion, competitors might "meticulously” duplicate or imitate his renditions of musical compositions. (Miller v Universal Pictures Co., 11 AD2d 47, 49, affd 10 NY2d 972, mot for rearg den 11 NY2d 721.) Since Shaw placed his arrangements in the public domain without the benefit of copyright protection, Time-Life was free to copy them and could truthfully state that the arrangements had been created by Artie Shaw. *206 (Jaccard v Macy & Co., 265 App Div 15; Shostakovich v Twentieth Century-Fox Film Corp., 196 Misc 67, 69, affd 275 App Div 692; see Brociner v Radio Wire Tel., 15 Misc 2d 843.) Since Artie Shaw "disposed of’ his arrangements with his name "used in connection therewith”, the privacy protections of the Civil Rights Law are not applicable. (See Geisel v Poynter Prods., 295 F Supp 331, 356; but cf. Neyland v Home Pattern Co., 65 F 2d 363, cert den sub nom. Curtis Pub. Co. v Neyland, 290 US 661.)
The plaintiff's claim for damages based on unfair competition, the fourth cause of action in the amended complaint, stands on a different footing. While Time-Life was entitled to copy Shaw’s arrangements and to compete with Shaw’s own records, Time-Life was under an obligation to "use reasonable care to inform the public of the source of its product” and to identify its own merchandise "lest it be mistaken for that of the plaintiff.” (Kellogg Co. v National Biscuit Co., 305 US 111, 119, rehearing den 305 US 674.) While the use of Shaw’s name is permissible, dishonesty in the. use of the name is condemned. (Chapman v Waterman Co., 176 App Div 697, 708, app dsmd 221 NY 637.) Time-Life could not "palm off” its records as being the personal work of Shaw, or, for that matter, the work of any of the other artists whose arrangements were copied by Time-Life. Nor could Time-Life generate consumer confusion regarding its product and that of its competition. (Miller v Universal Pictures Co., 11 AD2d 47, 49, affd 10 NY2d 972, mot for rearg den 11 NY2d 721, supra.)
The essence of an unfair competition claim is that the defendant assembled a product which bears so striking a resemblance to the plaintiff’s product that the public will be confused as to the identity of the products. (See David B. Findlay, Inc. v Findlay, 18 NY2d 12, 19-20, mot to amd remittitur granted 18 NY2d 676, cert den 385 US 930; Billy Rose’s Diamond Horseshoe v Ros-Mar Catering Corp., 138 NYS2d 160, 161.) The test is whether persons exercising "reasonable intelligence and discrimination” would be taken in by the similarity. (Dell Pub. Co. v Stanley Pub., 9 NY2d 126, 134.) The defendant’s promotional materials offered consumers an opportunity to purchase "Artie Shaw versions” of Swing Era classics. It is impossible to say, as a matter of law, that reasonably discriminating consumers would discern that these "versions” were not authentic Shaw performances, but were instead attempted re-creations by modern day musicians. *207 We believe that the plaintiff has made a sufficient factual showing to entitle him to present his case to the jury. A triable issue of fact exists as to whether reasonably discriminating members of the public would be confused or misled by defendant’s advertising. Thus, in this limited respect, the defendant’s motion for summary judgment was properly denied. (CPLR 3212, subd [b].) In holding that summary judgment was properly denied, we do not depart from the general rule that bare allegations are insufficient to create a genuine issue of fact. (See, e.g., Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338, 342; Ehrlich v American Moninger Greenhouse Mfg. Corp., 26 NY2d 255, 259.) Motions for summary judgment may not' be defeated merely by surmise, conjecture or suspicion. (Shapiro v Health Ins. Plan of Greater N. Y., 7 NY2d 56, 63; Bank for Sav. v Rellim Constr. Co., 285 NY 708, 709.) Rather, the plaintiff must establish the existence of material facts of sufficient import to create a triable issue. (CPLR 3212, subd [b]; Ehrlich v American Moninger Greenhouse Mfg. Corp., supra, p 259; 4 Weinstein-Korn-Miller, NY Civ Prac, par 3212.05c.) In this case, the plaintiff has met this burden.
One other point remains to be considered. In his third cause of action, the plaintiff alleged that the defendant’s phonograph records are musically inferior to his original recorded performances of "Temptation”, "Frenesí” and "Stardust”. The difference in quality, it is asserted, has injured his "credit and reputation” and caused him great pain, mental anguish, distress and humiliation. This cause of action is necessarily dependent upon proof of the unfair competition claim. If the defendant did not mislead the public into believing that they were purchasing copies of original Artie Shaw recorded performances, the plaintiff’s reputation could not have been injured, even if the musical quality of the defendant’s series was in fact inferior to his originals. Damage to one’s reputation can only occur where inferior work has been palmed off as the product of another whose goods are favorably received by the consuming public. On the other hand, where the palmed off product was equal or superior to that of the originator, there can be no damage to originator’s reputation. Thus, if Time-Life’s "re-creations” would only enhance listener appreciation for the musical artistry of Artie Shaw, his reputation could not be adversely affected. Since an issue of fact has been raised as to differences in the quality of the competing records, summary judgment was properly denied.
*208 Accordingly, the order of the Appellate Division should be modified by directing that summary judgment be granted to the defendant on the first and second causes of action stated in the amended complaint, and, as modified, affirmed. The certified question is answered in the negative.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order modified, with costs to abide the event, in accordance with the opinion herein and, as so modified, affirmed. Question certified answered in the negative.