CASTLE ROCK ENTERTAINMENT,
Plaintiff,

v.

CAROL PUBLISHING GROUP, INC.,
and Beth B. Golub, Defendants.

No. 95 CIV. 0775(SS).

United States District Court,
S.D. New York.

Feb. 27, 1997.

Davis, Scott, Weber & Edwards, P.C., David Dunn, Emily Granrud, New York City, for Plaintiff.

Beldock, Levine & Hoffman, LLP, Melvin L. Wulf, Daniel M. Kummer, New York City, for Defendant Carol Publishing Group, Inc.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff brings this action alleging copyright infringement and unfair competition flowing from defendants' publication of *The Seinfeld Aptitude Test* ("SAT"), a book of trivia concerning *Seinfeld,* a popular televi-

sion comedy program "about absolutely nothing." (Golub Dep. Ex. 3, cover). Though this seemingly invites the conclusion that this opinion is not about anything, plaintiffs claims raise a variety of difficult and interesting questions concerning the proper scope of copyright protection as it extends to popular television programming. For the reasons to be discussed, I grant plaintiffs motion for summary judgment on the issue of copyright infringement, finding that defendants have appropriated original material from *Seinfeld* without making "fair use" of the program. I deny plaintiffs motion for summary judgment with respect to its claim of unfair competition, however, because there are material issues in dispute concerning this claim.

## BACKGROUND

Plaintiff, Castle Rock Entertainment ("Castle Rock"), produced and now owns the copyrights to each episode of the highly successful television series *Seinfeld*, a comedy program featuring four characters confronting life's "daily, petty annoyances." (Shostak Dep. Ex. 3).[1] Defendants are the author, Beth Golub, and publisher, Carol Publishing Group, Inc. ("Carol"), of SAT, a book of trivia questions "based on the *Seinfeld* show." (Golub Dep. at 95). According to a view shared by the book's author, Beth Golub, and her editor at Carol Publishing, SAT represents a "natural outgrowth" of *Seinfeld.* (Golub Dep. Ex. 5 at 000606; Shostak Dep. Ex. 3). Indeed, "[SAT], like the *Seinfeld* show, is devoted to the trifling, picayune and petty annoyances encountered by the show's characters on a daily basis." (Golub Dep. Ex. 5 at 00606). In other words, defendants designed SAT to "capture *Seinfeld's* flavor in quiz book fashion." (Golub Dep. Ex. 5 at 000606).

In a proposal she submitted to Carol Publishing, Golub explained that she gathered the information tested in SAT by "watching and reviewing" *Seinfeld* episodes. (Golub Dep. Ex. 5 at 000606). During her deposition, Golub provided a more detailed account of her methods: she took notes from pro-

grams at the time they were aired on television, and she subsequently reviewed videotapes of several of the episodes, some of which she recorded and others that friends provided. (Golub Dep. at 20–21). Plaintiff reasons that Ms. Golub's proposal—with its "watching and reviewing" language—left Carol Publishing with constructive knowledge of Golub's practice of videotaping. Carol Publishing's representatives have denied, however, any actual knowledge that Golub reviewed *Seinfeld* episodes on tape. (Schragis Dep. at 91; Shostak Dep. at 62–64).

By defendant's count, SAT includes 643 trivia questions about the events and characters depicted in the *Seinfeld* show. The questions are presented in three forms: 211 are multiple choice; 93 are matching; and the remainder are simple questions. The book draws from 84 of the 86 *Seinfeld* episodes that had been broadcast as of the time that SAT was published in October 1994. The number of questions devoted to each episode ranges from a low of one to a high of 20. Every answer in the book arises from an episode of the show, though defendant Golub created incorrect answers as choices to the multiple choice questions. (Golub Dep. at 36, 94–95). Actual dialogue from the program is quoted in 41 of the book's questions. Though the parties cannot agree on the percentage of the show's overall dialogue excerpted in SAT, they offer figures—based upon the script most often referenced in the book, "The Cigar Store Indian"—ranging from a low of approximately 3.6 % (defendants' calculation) to a high of approximately 5.6 % (plaintiffs calculation).

The name "Seinfeld" appears on the front and back covers of SAT in larger print than any other word, in a typeface which, according to plaintiff, mimics the registered *Seinfeld* logo. (Golub Dep. Ex. 3). During editing, defendants increased the size of the name "Seinfeld" appearing on the back cover. (Shostak Dep. at 107–08). SAT also includes, both on its front cover and in several of its pages, pictures of the principal actors who

---

1. The parties have provided deposition excerpts as attachments to the affidavits submitted by David Dunn and Melvin Wulf in further support of or opposition to the motion for summary judgment.

appear in the *Seinfeld* series. On the back cover, as defendants note, a disclaimer appears indicating that SAT "has not been approved or licensed by any entity involved in creating or producing *Seinfeld*." (Golub Ex. 3, back cover). This language is in smaller print than is any other text in the book, but it is surrounded by a border and printed on a shaded background. Defendants contend that their decision to reduce the print size of this disclaimer, while at the same time surrounding it by a border and placing it upon a shaded background, represented an effort to highlight the disclaimer. Plaintiff contends that this decision was a blatant effort by defendants to reduce the prominence of the only indication provided that SAT was produced without plaintiffs cooperation or approval.

Because of its concern with preserving the show's reputation for quality, plaintiff has been highly selective in marketing products associated with *Seinfeld*. (Wittenberg Aff. ¶¶'s 14, 15). Plaintiff has rejected numerous proposals from publishers seeking approval for a variety of projects related to the show. (Wittenberg Aft. ¶ 23). Plaintiff has licensed the production of a single *Seinfeld* book, *The Entertainment Weekly Seinfeld Companion*, and only after threatening litigation in connection with the book's initial unauthorized release. (Wittenberg Aff. ¶ 25). Also, plaintiff has licensed the production of a CD–ROM product which includes discussions of *Seinfeld* episodes, and which might ultimately include a trivia bank. Plaintiff now alleges that it plans to pursue a more aggressive marketing strategy in the future, a strategy which will include the "publication of books related to Seinfeld." (Wittenberg Aff. ¶ 21). The creative team responsible for *Seinfeld* would have to be assured creative control over any such projects, however. (*Id.* at ¶ 23; Wittenberg Dep. at 52). Because that creative team, consisting of Jerry Seinfeld and his partner, Larry David, does not now wish to be distracted from the program, it appears that there has been little, if any, progress in developing such books or products. (*Id.*).

There is no evidence that the publication of SAT has diminished interest in *Seinfeld*, or that the profitability of the *Seinfeld* logo "has been reduced in any way at all." (Wittenberg Dep. at 110). In fact, the show's audience has grown since SAT was first published. (*Id.* at 109). The television network that broadcasts episodes of Seinfeld has distributed copies of SAT in connection with promotions for the program. (Aronson Dep. at 26). Even the executive producer of Seinfeld, George Shapiro, benignly characterizes SAT as "a fun little book." (Shapiro Dep. at 33). Nevertheless, it is a book which plaintiff believes "free-rides" on the success of *Seinfeld*, and plaintiff therefore seeks to bar its continued publication.

Plaintiff now moves for summary judgment on its claims of copyright infringement and unfair competition, arguing that SAT is either an unauthorized reproduction, or derivative version, of *Seinfeld*.[2] Defendants cross-move for summary judgment, claiming that SAT is not substantially similar to *Seinfeld*, and that, in any event, the book is protected as "fair use" under the Copyright Act. For the reasons that follow, the Court finds for plaintiff with respect to its claims under the Copyright Act, but is unable to grant either party summary judgment on plaintiffs common law claim of unfair competition.

## DISCUSSION

Summary judgment is required when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party has the initial burden of 'informing the district court of the basis for its motion' and identifying the matter 'it believes demonstrate[s] the absence of a genuine issue of material fact.' " *Leibovitz v. Paramount Pictures Corp.,* 948 F.Supp. 1214, 1217 (S.D.N.Y.1996) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Once the movant satisfies its initial burden, the non-

---

**2.** Plaintiff is not now seeking judgment on its claim that defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988).

moving party must identify "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In assessing the parties' competing claims, the Court must resolve any factual ambiguities in favor of the nonmovant. *See McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993). It is within this framework that the Court must finally determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## I. Prima Facie Copyright Liability

The Copyright Act grants a copyright holder a variety of rights, including the exclusive rights to "reproduce the copyrighted work" and "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106. To succeed on a claim that these rights have been infringed, a plaintiff must demonstrate two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Serv., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991) (citations omitted); *see also Arica Institute, Inc. v. Palmer,* 970 F.2d 1067, 1072 (2d Cir. 1992). Defendants do not dispute that plaintiff is the owner of a valid copyright in the individual *Seinfeld* episodes and scripts. The question of infringement therefore turns upon whether SAT is an impermissible copy of *Seinfeld.*

### A. Copying

"[A] plaintiff must first show that his [or her] work was actually copied ... [and] then must show that the copying amounts to an 'improper' or 'unlawful' appropriation." *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139–40 (2d Cir.1992) (citations omitted);

*see also* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B], at 13–19 (1996) ("First, there is the factual question whether the defendant, in creating its work, used the plaintiffs material as a model, template, or even inspiration."). Ordinarily, there is no direct evidence of actual copying, and the Court is called upon to "infer [such copying] upon a showing that defendant had access to the copyrighted work, and that the allegedly infringing material bears a substantial similarity to the copyrightable elements of plaintiffs work." *Arica,* 970 F.2d at 1072; *see also Twin Peaks Productions, Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1372 (2d Cir.1993) ("The plaintiff may establish copying either by direct evidence or by showing that the defendant had access to the plaintiffs work and that the two works are substantially similar."). In this case, this inquiry is not necessary in order for the Court to make its initial determination that SAT in fact copied from *Seinfeld.*

Defendants make "no secret" of the fact that SAT is based upon *Seinfeld.* (Golub Dep. at 95). SAT is expressly devoted to testing elements from the program. Every correct answer to each of the 643 questions posed in the book reflects information derived directly from *Seinfeld* episodes. (*Id.* at 36). Moreover, many of the questions posed in SAT, upwards of forty, actually quote dialogue, verbatim, from the show. Such statistics should come as no surprise; a trivia book about *Seinfeld* would make little sense if it tested matters not included in the program, or if it attributed dialogue to characters which they never spoke. Simply put, there can be no real dispute that, as a factual matter, SAT copies information and dialogue from *Seinfeld.*[3]

The determination that SAT serves as is its own direct evidence of copying does not remove substantial similarity from the infringement equation. *See Twin Peaks,* 996

---

**3.** Plaintiff argues that defendant Golub's practice of videotaping episodes of *Seinfeld* as an intermediate step in the creation of SAT constitutes prima facie infringement regardless of the content of the show ultimately reflected in the book. (Memorandum of Law in Support of Plaintiffs Motion for Partial Summary Judgment at 5–7).

Because the Court finds that SAT copies *Seinfeld,* it is not necessary to reach this question. In any event, while defendant Golub certainly copied *Seinfeld* by taping the program, the record reveals no evidence requiring the conclusion that defendant Carol was involved in, or had constructive knowledge of, Golub's practice.

F.2d 1366. In *Twin Peaks,* the defendant published a book which was primarily devoted to digesting episodes of another popular television program, *Twin Peaks.* Addressing the concept of "fragmented literal similarity," the Court determined that 89 lines of dialogue copied from the show rendered the book "substantially similar" to the program. *Id.* at 1372. Because the book digested entire episodes, the Court found that there was "comprehensive nonliteral similarity" between the two works, as well. *Id.* Of course, the Second Circuit could have found copying, as a factual matter, without searching for substantial similarity; with 89 lines of dialogue quoted in the allegedly infringing book, it was inescapable that some copying had taken place. It is apparent, then, that the Second Circuit applied a substantial similarity test devoted to finding more than mere copying; it applied a test meant to determine whether the copying which had taken place was significant as a matter of law.

■ "The presence of a 'substantial similarity' requirement in both prongs of the analysis—actual copying and whether the copying constitutes an improper appropriation—creates the potential for unnecessary confusion, especially because a plaintiff need not prove substantial similarity in every case in order to prove actual copying." *Laureyssens,* 964 F.2d at 140; *see also* 3 Nimmer § 13.01[B], at 13–11 to 13–12 (distinguishing probative similarity from substantial similarity). Where there is no direct evidence of copying, as a factual matter, a substantial similarity between the two works creates an inference of such copying. Where there are sufficient similarities to permit such an inference, or where there is direct evidence of actual copying, the question becomes whether there is substantial similarity as a matter of law. At this stage, substantial similarity becomes a function of whether defendant copied "elements of the work that were original." *Feist,* 499 U.S. at 361, 111 S.Ct. at 1296; *Laureyssens,* 964 F.2d at 140 (upon finding direct proof of actual copying, Court's "central concern" became whether there was "unlawful appropriation of protected material."). For those reasons already explained, the first of these inquiries is unnecessary in the present case; by its very nature, SAT copies at least some material from *Seinfeld.* The legally significant question therefore becomes whether the copying which took place rendered the two works substantially similar as a matter of law—*i.e.,* whether SAT copied "elements of [*Seinfeld* ] that were original." *Id.*

## B. Original Elements of *Seinfeld*

■ "The *sine qua non* of copyright is originality." *Feist,* 499 U.S. at 345, 111 S.Ct. at 1287. Indeed, it is for this reason that "[n]ot all copying ... is copyright infringement," but only the copying of the original elements of a protected work. *Id.* at 361, 111 S.Ct. at 1296. Addressing this point, defendants invoke a fact/expression distinction that has proven decisive in numerous infringement cases. *See, e.g., Feist,* 499 U.S. at 341, 111 S.Ct. at 1285–86 (finding no infringement where defendant produced a multi-county phone directory, in part, by obtaining names and phone numbers from plaintiffs single-county directory); *Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (finding infringement where defendant published magazine article which did not merely include facts revealed by President Ford in his as yet unpublished memoirs, but which excerpted the President's expression of those facts); *Worth v. Selchow & Righter Co.,* 827 F.2d 569 (9th Cir.1987) (finding no infringement where defendant incorporated facts chronicled in plaintiffs reference books into a trivia game), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988). Specifically, defendants argue that SAT does not copy plaintiffs protected expression, but merely quizzes readers as to the show's underlying facts and ideas.

Consideration of the logic underlying the fact/expression distinction reveals a fundamental flaw in defendants' reasoning. The fact/expression dichotomy has been developed in a series of cases concerning the publication of nonfiction works and factual compilations. *See, e.g., Feist,* 499 U.S. at 341, 111 S.Ct. at 1285–86 (compilation); *Harper & Row,* 471 U.S. 539, 105 S.Ct. 2218 (nonfiction history). The facts reported in such works "do not owe their origin to an act

of authorship." *Feist,* 499 U.S. at 347, 111 S.Ct. at 1288. Accordingly, courts have adopted an approach "permitting free communication of [these] facts while still protecting an author's expression." *Harper & Row,* 471 U.S. at 556, 105 S.Ct. at 2228 (quoting, with approval, lower court's decision, reported at 723 F.2d 195, 203 (2d Cir.1983)). Specifically, protection extends only to the original manner in which the copyright holder expresses or compiles the facts that are reported, and not to the facts themselves. *See, e.g., Harper & Row,* 471 U.S. 539, 105 S.Ct. 2218; *Feist,* 499 U.S. 340, 111 S.Ct. 1282. This is an appropriate resolution of the tension between facts and expression because the facts of a nonfiction work simply "do not contain the requisite originality and creativity required as the *'sine qua non* of copyright.' " *Arica,* 970 F.2d at 1074 (citing *Feist,* 499 U.S. at 345, 111 S.Ct. at 1287).

By contending that they are not reproducing original expression from *Seinfeld,* but only "uncopyrightable facts about the *Seinfeld* show," plaintiffs are staking their claim upon a false premise. (Defendant's Memorandum of Law in Opposition to Plaintiffs Motion for Partial Summary Judgment at 7). SAT does not pose "factual" questions about the *Seinfeld* show; it does not ask who acts in the program, who directs or produces the show, how many seasons it has run, etc. Instead, SAT poses questions about the events depicted during episodes of the *Seinfeld* show. The facts depicted in a *Seinfeld* episode, however, are quite unlike the facts depicted in a biography, historical text, or compilation. *Seinfeld* is fiction; both the "facts" in the various Seinfeld episodes, and the expression of those facts, are plaintiffs creation. Thus, while defendants' book does not report plot developments and digest programs, as in *Twin Peaks,* SAT is devoted to questions concerning creative components of *Seinfeld.* In other words, by copying "facts" that plaintiff invented, SAT "appropriate[s] [plaintiffs] original contributions." *Harper & Row,* 471 U.S. at 548, 105 S.Ct. at 2224. Thus, to find in defendant's favor merely by rote application of the rule against affording copyright protection to facts would be to divorce that rule from its underlying rationale. Simply put, and of most direct concern under the Copyright Act, defendants have appropriated original elements of plaintiffs work.

Though treating the issue in a very different context, the most recent Second Circuit decision concerning the fact/expression dichotomy provides additional support for this Court's conclusion. *See National Basketball Association v. Motorola, Inc.,* 105 F.3d 841 (2d Cir.1997) (hereinafter *"NBA"* ). In *NBA,* the National Basketball Association claimed that defendant infringed their valid copyright in televised professional basketball games by reporting the scores of those games, during play, to purchasers of their electronic pagers. In finding for defendants, the Court drew a distinction very illuminating for present purposes: the Court noted that, "[u]nlike movies, plays, *television programs,* or operas, athletic events have no underlying script." *Id.* at 846 (emphasis added). On this basis, the Court concluded that the facts of a game (*e.g.,* the score, the foul situation, the time remaining, etc.) could not be protected by the Copyright Act; only those aspects of a broadcast that are under the NBA's creative control merited such protection (*e.g.,* camera angles, commentary, graphics, etc.). The present case, of course, presents the opposite situation; this case involves facts copied from a "television program" with an "underlying script." Unlike the facts of a professional basketball game (or the facts compiled in a phone directory or biography), the facts revealed during an episode of *Seinfeld* are created by the show's writers. Thus, by reporting "facts" from each episode—whether by transmitting them on a pager, or by including them as the answers to a set of trivia questions—defendants have appropriated "original components" of plaintiffs protected work.

## C. Willfulness

■ Though it is not essential to a finding of liability under the Copyright Act, the question of whether a defendant's infringement was willful does have a significant bearing upon the potential damages to be awarded in connection with the violation. *See* 17 U.S.C. § 504(c)(2). "[A] court need not find that an infringer acted maliciously to find

willful infringement." *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir.1986). "The standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the possibility." *Twin Peaks*, 996 F.2d at 1382.

The parties have not briefed the question of damages, and the Court is hesitant to make a finding of willfulness outside the context of the damages question which it implicates. Nevertheless, the record provides clear evidence, at a minimum, of defendants' reckless disregard for the possibility that their conduct amounted to copyright infringement. *See Twin Peaks*, 996 F.2d at 1382. First, defendants were on notice that *Seinfeld* is a protected work: each televised episode commences with a copyright notice. (Wittenburg Aff. ¶ 10). Also, all the defendants are sophisticated with respect to such matters. Defendant Golub is an attorney. Mr. Shragis, Carol's publisher, testified that his company has had experience with the copyright laws, and that he is familiar with the requirements of those laws. (Schragis Dep. at 17, 73–74, 93, 107–09). Finally, Carol continued to publish and distribute SAT after receiving actual notice from plaintiff demanding that Carol cease and desist publication. (Schragis Dep. at 17–19). In other words, defendants continued in their infringement even "after receiving a specific warning." *See Twin Peaks*, 996 F.2d at 1382.

## II.  Fair Use

As the preceding discussion demonstrates, plaintiff has established a prima facie case of infringement by showing that SAT appropriates original elements from *Seinfeld*. Defendants argue, however, that, even if SAT is an unauthorized copy of *Seinfeld*—as the Court has found it to be—the book is protected by the "fair use" doctrine. As set out in the Copyright Act:

> the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include ——

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. "[T]he applicability of the fair use defense is ordinarily a factual question for the jury to determine." *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1143 (S.D.N.Y.1980), *aff'd*, 672 F.2d 1095 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *see also Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230 ("Fair use is a mixed question of law and fact."); *Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1258 (2d Cir.1986) ("Because the fair use question is so highly dependent on the particular facts of each case, courts ... have usually found it appropriate to allow the issue to proceed to trial."), *cert. denied*, 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987). However, where the district court has "facts sufficient to evaluate each of the statutory factors," it may conclude as a matter of law that the challenged use is not a protected fair use. *Harper & Row*, 471 U.S. at 560, 105 S.Ct. at 2230; *see also Leibovitz*, 948 F.Supp. at 1217–18 (citing several cases for the proposition "that a rejection of the fair use defense and a subsequent finding in favor of a copyright plaintiff ... may be appropriate at summary judgment.").

### A.  Purpose And Character Of The Use

■ "The enquiry here may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 578, 114 S.Ct. 1164, 1171, 127 L.Ed.2d 500 (1994). Though it may be "extravagant" to characterize SAT as a work of criticism or comment, the Court "must be alert to the risk of permitting subjective judgments about quality to tilt the scales on which the

fair use balance is made." *Twin Peaks,* 996 F.2d at 1374. Surely a text testing one's knowledge of Joyce's *Ulysses,* or Shakespeare's *Hamlet,* would qualify as "criticism, comment, scholarship, or research," or such. The same must be said, then, of a text testing one's knowledge of Castlerock's *Seinfeld. Id.* ("A comment is as eligible for fair use protection when it concerns 'Masterpiece Theater' and appears in the New York Review of Books as when it concerns 'As the World Turns' and appears in Soap Opera Digest."). Thus, the Court is satisfied that SAT "serves one or more of the non-exclusive purposes that section 107 identifies as examples of purposes for which a protected fair use may be made." *Id.*

■ As the Supreme Court recently explained, the "central purpose" of the Court's inquiry into the character and purpose of an allegedly infringing work must be to determine whether that work is "transformative." *Campbell,* 510 U.S. at 578–80, 114 S.Ct. at 1171; *see also Twin Peaks,* 996 F.2d at 1375. Put differently, the analysis properly focuses upon whether "the new work merely 'supersedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579, 114 S.Ct. at 1171 (citations omitted). Though plaintiff insists that SAT is not at all creative, the Court concludes otherwise. Given the absence of any case law addressing the copyright status of a work completely devoted to posing trivia questions about the fictional elements of another work, it is clear that SAT is itself an "original creation." By testing *Seinfeld* devotees on their facility at recalling seemingly random plot elements from various of the show's episodes, defendants have "added something new" to *Seinfeld,* and have created a work of a "different character" from the program. It may even be said that defendants have identified a rather crea-

tive and original way in which to capitalize upon the development of a "T.V. culture" in our society; a culture in which the distinction between fiction and fact is of declining consequence, and in which people are as concerned with the details of the former as the latter.

■ The Court's finding that SAT is a transformative work, though important, is not dispositive in defendant's favor. Indeed, it is a basic axiom of copyright law that the unauthorized production of derivative works can give rise to a successful claim of infringement. *See* 1 Nimmer § 3.06, at 3–34.4; *see also Rogers v. Koons,* 751 F.Supp. 474 (S.D.N.Y.1990) (rejecting fair use claim raised by defendant charged with unauthorized creation of a derivative work), *aff'd* 960 F.2d 301 (2d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). And a derivative work, by definition, transforms an original. *See* 17 U.S.C. § 101 (defining a "derivative work" as one which is "based upon," but which "recast[s], transform[s], or adapt[s]," an original); *see also Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905 (2d Cir.1980) (explaining that in order to be classified as a derivative, a work must contain some "substantial, not merely trivial, originality"). Thus, to hold that the transformative nature of a work automatically shields it from a successful claim would be to reject an unassailable proposition—*i.e.,* that the unauthorized production of a derivative can support a claim for infringement. The question of whether a work is transformative must therefore be most decisive when answered in the negative. If a work is not transformative, "fair use should perhaps be rejected without further inquiry into the other factors." [4] Pierre N. Leval, Toward a Fair Use Standard, 103 Harv.L.Rev. 1105, 1116 (1990). Where, as here, a work is transformative, the crux of the fair use analysis remains: the Court must proceed with a careful consideration of the remaining three factors, while merely granting defendants an advantage at the outset.

---

**4.** Though a useful generalization, this statement should not be elevated to the status of a rule applicable in all situations. For instance, the Supreme Court has held that the practice of video taping programs for subsequent private viewing represents a fair use, but did not suggest that such video taping is "transformative." *See*

*Sony Corp. of America v. Universal City Studios,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Even without this factor, the Court was satisfied that the creation of a tape designated solely for noncommercial, private enjoyment, represents a fair use under the Copyright Act.

■ Defendants' initial advantage must be tempered, if only slightly, by the fact that their creation and publication of SAT was a commercial endeavor. The Copyright Act "plainly assigns a higher value to a use that serves 'nonprofit educational purposes' than to one of a 'commercial nature.' " *Twin Peaks*, 996 F.2d at 1374. This factor must not be unduly emphasized, however. As the Supreme Court reasoned in *Campbell*, "[i]f ... commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107 ... since these activities 'are generally conducted for profit in this country.' " *Campbell*, 510 U.S. at 584, 114 S.Ct. at 1174 (citations omitted); *see also Robinson v. Random House, Inc.*, 877 F.Supp. 830, 840 (S.D.N.Y. 1995) ("because nearly all authors hope to make a profit with their work, courts should be wary of placing too much emphasis on the commercial nature in a fair use determination."). Thus, the commercial nature of SAT reduces—but does not nearly eliminate—the significance properly ascribed to the transformative quality of defendants' work.

### B. Nature Of The Copyrighted Work

■ "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586, 114 S.Ct. at 1175. As already discussed, originality is the core concern of copyright protection. *See Feist*, 499 U.S. at 345, 111 S.Ct. at 1287. If the second factor of the fair use test "favors anything," then, "it must favor a creative and fictional work, no matter how successful." *Twin Peaks*, 996 F.2d at 1376; *see also Stewart v. Abend*, 495 U.S. 207, 237, 110 S.Ct. 1750, 1769, 109 L.Ed.2d 184 (1990) ("In general, fair use is more likely to be found in factual works than in fictional works."). *Seinfeld* is a highly successful fictional and creative work. As defendants concede in their opposition papers, plaintiff thereby has a decisive advantage with respect to the second factor of the fair use analysis. (Defendant's Memorandum of Law in Opposition to Plaintiffs Motion for Partial Summary Judgment at 14–15).

### C. Substantiality Of The Portion Used

■ In addressing this factor, the parties engage in an almost academic deconstruction of *Seinfeld*, with their analysis ultimately devolving into an exercise in counting the number of words extracted from particular scripts and episodes. Adapting competing methodologies, and failing to agree upon correct word counts, the parties arrive at different measures of the extent of copying that took place. For instance, plaintiff estimates that SAT copies 5.6% of the *Seinfeld* episode most often referenced in the book; defendants concede only 3.6%. Accepting defendants' calculations, as is in accord with the appropriate presumptions for summary judgment purposes, the 3.6% figure does little to advance defendants' cause.

Though the Court recognizes that a quantitative approach to addressing the substantiality question has a place in the analysis, it is clear that even small amounts of material extracted from an original work can suffice to counter a claim of fair use. *Twin Peaks*, 996 F.2d at 1372 (finding infringement where defendant excerpted a total of 89 lines of dialogue from several episodes of a protected television program); *Harper & Row*, 471 U.S. at 564–65, 105 S.Ct. at 2232–33 (finding infringement where defendant excerpted approximately 400 words of a full length book); *Roy*, 503 F.Supp. 1137 (upholding jury verdict finding infringement where defendant broadcast a series of film clips from six full-length films by Charlie Chaplin). In other words, the substantiality factor "has both a quantitative and a qualitative element to it." *Wright v. Warner Books*, 953 F.2d 731, 738 (2d Cir.1991). If a challenged work appropriates what amounts to "the heart" of an original work, even if only in a few words, then such an appropriation is substantial for purposes of the fair use inquiry. *See Harper & Row*, 471 U.S. at 565, 105 S.Ct. at 2233.

The Court's determination that SAT is substantially similar to *Seinfeld* "so as to be prima facie infringing should suffice for a determination that the third fair use factor

favors the plaintiff." *Twin Peaks,* 996 F.2d at 1377. Indeed, whether under the rubric of prima facie copying or the fair use defense, it is inescapable that SAT appropriates essential elements of *Seinfeld,* and that *Seinfeld* is essential to SAT. Beginning with the significance that the appropriated material has in relation to the *Seinfeld* show, a brief review of SAT confirms that the book invokes all of the show's main characters, and many of the show's most humorous plot elements. Perhaps more to the point, SAT seizes upon the notion which lies at the very heart of *Seinfeld*—that there is humor in the mundane, seemingly trivial, aspects of every day life. Indeed, by inviting its readers to recall literally 643 bits of information from various *Seinfeld* episodes, SAT "follow[s] the basic premise of the *Seinfeld* show by focusing on minutiae in the day-to-day lives of the show's characters." (Shostak Dep. Ex. 2 at 000604). As defendants boasted before the onset of this litigation, SAT succeeds at "capturing [*Seinfeld's* ] flavor in quiz book fashion." (Golub Dep. Ex. 5 at 00606).

The "amount and substantiality" fair use factor is addressed primarily to the very matter considered by the Court in the preceding paragraph, *i.e.,* "the volume and substantiality of the work used with reference to the copyrighted work, not to the allegedly infringing work as a whole." 17 U.S.C. § 107(3). The Second Circuit, however, has deemed it useful also to consider "the amount and substantiality of the protected passages in relation to the work accused of infringement." *Wright,* 953 F.2d at 739. Not only does SAT draw upon significant elements of the *Seinfeld* program, but SAT introduces relatively little additional material into the mix. Though the book transforms the program by employing a trivia game format, that trivia game relates exclusively to events as they are depicted in the *Seinfeld* program. Simply put, without *Seinfeld,* there can be no SAT. *See Salinger v. Random House,* 811 F.2d 90, 99 (2d Cir.) (finding that quantitatively modest excerpting from plaintiffs personal letters was substantial where those excerpts, "[t]o a large extent,

[made defendant's] book worth reading."), *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987); *see also Addison–Wesley Publishing Co. v. Brown,* 223 F.Supp. 219, 223–24 (E.D.N.Y.1963) (stressing that defendant's book, a manual consisting of the answers to a set of physics problems included in plaintiffs college course book, had "no independent viability."); *Midway Mfg. Co. v. Artic Int'l, Inc.,* 1981 WL 1390, * 9 (N.D.Ill. 1981) ("[If] defendant's device would only have value because of plaintiffs particular copyrighted audio visual image, then plainly defendant's device would only have value because of plaintiffs particular copyrighted audio visual work. Defendant, thus, by selling its device reaps the benefits of plaintiffs artistic endeavor."). In sum, defendants have identified and appropriated the most important elements of *Seinfeld,* and have made them the most important elements of SAT.

Previously, the Court emphasized that its finding that SAT is transformative of *Seinfeld* cannot be dispositive for defendants, because such a holding would discredit the proposition that the unauthorized production of a derivative work can be infringing. On similar logic, the Court's finding that SAT incorporates a substantial amount from *Seinfeld* cannot be dispositive in plaintiffs favor. Because a finding of substantial similarity is a prerequisite to a prima facie claim of infringement, such a finding cannot negate the possibility of fair use. Otherwise, the fair use provision of the Copyright Act would amount to little more than a false promise of a viable defense; there would be no real chance that a prima facie case of infringement could ever be negated by a showing of fair use. The first three factors of the fair use analysis, then, suggest a somewhat unsatisfying result; plaintiff has an advantage, but one that is hardly compelling or dispositive.

### D. Effect On Potential Market

The effect on the market for the copyrighted work is "undoubtedly the single most important element of fair use."[5] *Har-*

---

5. The Second Circuit has recently suggested that, by "conspicuously omit[ting] this phrasing" in a

recent discussion of the fair use standard, the Supreme Court has placed the "effect on poten-

*per & Row,* 471 U.S. at 566, 105 S.Ct. at 2233; *see also Robinson,* 877 F.Supp. at 842. For purposes of this inquiry, "harm to both the original and derivative works must be considered." *Robinson,* 877 F.Supp. at 842. As for the original work, defendants stress that SAT has not and cannot be expected to reduce interest in *Seinfeld.* The Court agrees; SAT compliments *Seinfeld.* The book is only of value to a regular viewer of the program. Moreover, though plaintiff proclaims plans to enter derivative markets with books about *Seinfeld,* there is little suggestion—and certainly not enough to remove all material doubt—that such projects are anything more than a remote possibility. *See Wright,* 953 F.2d at 739 ("Plaintiff offered no evidence that the project will go forward."). Indeed, if past practice provides any indication, plaintiff will be slow to develop any such works for fear of compromising *Seinfeld's* reputation for quality.

This does not end the analysis, however; "the proper inquiry concerns the 'potential market' for the copyrighted work." *Salinger,* 811 F.2d at 99. More broadly, the inquiry must extend even to the potential market for as yet nonexistent derivative works. *Campbell,* 510 U.S. at 591–93, 114 S.Ct. at 1178 (accepting defendant's position that rap music parody of the song, Pretty Woman, would not detract from sales of the original, but remanding for determination as to whether parody would effect the market for hypothetical non-parody "rap derivatives" of Pretty Woman.). In other words, the Court must consider not only whether SAT detracts from interest in *Seinfeld,* or even whether SAT occupies markets that plaintiff intends to enter; the analysis is whether SAT occupies derivative markets that plaintiff may potentially enter. *Id.; see also Rogers,* 751 F.Supp. at 480 ("I do not think the case turns upon Rogers' past conduct or present intention as much as it does upon the existence of a recognized market for new versions or new uses of the photograph, which unauthorized

use clearly undermines."). At first blush, this seems to create an impossible standard for a defendant to satisfy; any time there is a successful infringing work (*i.e.,* one likely to provoke a law suit), it necessarily means that defendants are filling a "potential" market that would otherwise be available for plaintiffs taking. *See* 3 Nimmer § 13.05[A][4], at 13–187. Properly understood, however, the "potential markets" standard erects no such barrier to a finding of fair use.

The term "potential markets" does not properly encompass all conceivable markets for an original and its derivatives. "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell,* 510 U.S. at 592, 114 S.Ct. at 1178. The examples of parody and criticism should serve to clarify and illustrate this proposition. By the very nature of such endeavors, persons other than the copyright holder are undoubtedly better equipped, and more likely, to fill these particular market and intellectual niches. *See Campbell,* 510 U.S. at 592, 114 S.Ct. at 1178 ("there is no protectable derivative market for criticism."); *New Era Publications, Int'l v. Carol Publishing Group,* 904 F.2d 152, 160 (2d Cir.) ("a critical biography serves a different function than does an authorized, favorable biography, and thus injury to the potential market for the favorable biography by the publication of the unfavorable biography does not affect application of factor four."), *cert. denied,* 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990); *Leibovitz,* 948 F.Supp. at 1216 ("although derivative markets are an appropriate consideration in a fair use analysis, there is no protectable derivative market for criticism."). Here, the Court sees no reason that the market for derivative game versions of *Seinfeld* is a market that should be reserved for persons other than plaintiff. A *Seinfeld* trivia game is not critical of the

---

tial markets" factor on an equal footing with the remaining three fair use considerations. *American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 926 (2d Cir.1994) (citing *Campbell,* 510 U.S. at 578–80, 114 S.Ct. at 1171). Given the vigor with which the Supreme Court has emphasized this factor in the past, this Court hesitates in

adapting the Second Circuit's dicta. In any event, because neither party has any considerable advantage through the Court's consideration of the first three fair use factors, the effect on the potential markets—however important it is relative to the remaining factors—will be determinative in this case.

program, nor does it parody the program; if anything, SAT pays homage to *Seinfeld.* The market for such works is one that should properly be left to plaintiff's exclusive control.

The Court's resolution of the "potential markets" inquiry is not effected by the prospect that plaintiff will choose to leave this particular derivative market unsatisfied. *See Salinger,* 811 F.2d at 99 ("the need to assess the effect on the market for Salinger's letters is not lessened by the fact that their author has disavowed any intention to publish them during his lifetime."). The Court is persuaded that there is a meaningful difference, for purposes of the Copyright Act, between a copyright holder's failure to occupy a particular market as a matter of choice, and a failure to occupy such a market as a matter of neglect. *Id.* In a manner of speaking, plaintiff has exercised its control over derivative markets for *Seinfeld* products, if only by its decision to refrain from inundating those markets. Indeed, artists express themselves not merely by deciding what to create from their original work, but by deciding what not to create as well. *Cf. Harper & Row,* 471 U.S. at 559, 105 S.Ct. at 2230 ("freedom of thought and expression 'includes both the right to speak freely and the right to refrain from speaking at all.'") (citations omitted). It would therefor not serve the ends of the Copyright Act—*i.e.,* to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original. Where nothing in the nature of criticism or parody is at issue, this creative choice must be respected.

### E. Aggregate Fair Use Assessment

█ Though there are numerous competing considerations which make this decision a difficult one, the Court is persuaded that, on balance, SAT does not represent a fair use of *Seinfeld.* Only one of the four statutory factors favors defendant, and then, only by a generous understanding of what it means for a work to be "transformative." Plaintiff prevails with respect to each of the remaining three factors: *Seinfeld* is a work of fiction,

and such works are accorded special status in copyright law; SAT draws upon "essential" elements of *Seinfeld,* and it draws upon little else; and, most importantly, SAT occupies a market for derivatives which plaintiff—whatever it decides—must properly be left to control. In short, SAT does not make fair use of *Seinfeld,* and plaintiff must accordingly be granted summary judgment on its claim of copyright infringement. *See Wright,* 953 F.2d at 740 ("a party need not 'shut-out' her opponent on the four factor tally to prevail.").

### III. Common Law Unfair Competition

█ In order to succeed on a claim of common law unfair competition under New York law, plaintiff must establish the bad faith misappropriation of its labor and expenditure resulting in the likelihood of confusion as to the source of the product. *See Kraft General Foods v. Allied Old English, Inc.,* 831 F.Supp. 123, 135 (S.D.N.Y.1993); *Shaw v. Time–Life Records,* 38 N.Y.2d 201, 206, 379 N.Y.S.2d 390, 395, 341 N.E.2d 817 (1975). "Thus, some showing of bad faith is crucial to the claim." *Brown v. Quiniou,* 744 F.Supp. 463, 473 (S.D.N.Y.1990). The Court must also determine "whether persons exercising 'reasonable intelligence—and discrimination' would be taken in by the similarity" between the two products. *Shaw,* 38 N.Y.2d at 206, 379 N.Y.S.2d 390, 341 N.E.2d 817 (citations omitted). In other words, plaintiff must prove a likelihood of confusion among members of the general public as to the source of defendants' work. *See Charles Of The Ritz Group, Ltd. v. Quality King Distributors, Inc.,* 832 F.2d 1317, 1321 (2d Cir.1987); *Weight Watchers International, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1283 (S.D.N.Y.1990).

"Likelihood of confusion is usually measured by applying the test formulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d at 495." *See Weight Watchers,* 744 F.Supp. at 1269; *see also Twin Peaks,* 996 F.2d at 1379 (remanding to the district court for a "full" examination of the *Polaroid* factors in connection with plaintiffs claim of trademark infringe-

ment). Specifically, the Court must balance the following factors:

> the strength of [the owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.[6]

*Polaroid*, 287 F.2d at 495. Despite the stature of the "venerable *Polaroid* factors," the parties have not addressed, or even identified, most of these considerations in their discussion of consumer confusion. *See Twin Peaks*, 996 F.2d at 1379.

▆▆▆ The matters that the parties have focused upon simply are not so compelling as to merit summary judgment. Plaintiff begins by arguing that defendants have created confusion as to the sponsorship of SAT by including the name "Seinfeld" in the book's title, and by referring to the *Seinfeld* show in promotional materials. (Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment at 23–24). As defendants explain, however, "there's no secret that the book is based on the show." (Golub Dep. at 95). The book is expressly directed to devotees of the television program, and it is dedicated to testing their knowledge of the show. It is all but inevitable that the *Seinfeld* name would be invoked in the book's title and in its advertising. *See Twin Peaks*, 996 F.2d at 1379 (there can be "little question that the title is of some artistic relevance to the Book."). "The question then is whether the title," and advertising, "is misleading in the sense that it induces members of the public to believe the Book was prepared or otherwise authorized by [defendants]." *Twin Peaks*, 996 F.2d at 1379.

Plaintiff argues that there are similarities between the word "Seinfeld" as it appears on the cover of SAT and the *Seinfeld* logo which

reveal defendants' intention to mislead consumers as to the origin of the book. Specifically, the *Seinfeld* logo and the word "Seinfeld" as it appears on the front cover of SAT share similar type face, and the *Seinfeld* lettering on the back cover appears in the same red coloring as the logo. Moreover, the word *Seinfeld* is prominently featured on the front and back covers of SAT. Though the Court agrees that there are unmistakable similarities between the *Seinfeld* logo and the SAT cover, there are distinct differences, as well. Most notably, the *Seinfeld* logo is written on a slant, with an inverted triangle over the "i." The word "Seinfeld," as it appears on the cover of SAT, is not adorned with any such flourishes.

Even accepting that the word "Seinfeld," as it appears on the cover of SAT, bears an unlikely resemblance to the *Seinfeld* logo, there is another important aspect of the SAT cover—the disclaimer on the back cover of the book—which is sufficient to create an issue of fact on the questions of bad faith and consumer confusion. "Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship." *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1052–53 (2d Cir. 1983) ("We are satisfied that the disclaimer is adequate to distance CU and Regina"), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). The parties, predictably enough, have sharply contrasting views of the disclaimer set out on the back cover of SAT. Plaintiff stresses the small lettering of the disclaimer; lettering that was reduced in size shortly before publication and made smaller than any other text in the book. Defendants draw the Court's attention to the black border surrounding the disclaimer, and to the shaded background allegedly designed to highlight that disclaimer. For purposes of the parties' competing claims for summary judgment, the Court is simply unable to find

---

6. Though this formulation has been developed in the context of federal claims under the Lanham Act for trademark infringement, it has also been applied to common law claims of unfair competition, and it reaches the identical "likelihood of confusion" issue which is of present concern. *See e.g., Weight Watchers*, 744 F.Supp. at 1283 ("Common law unfair competition claims closely parallel Lanham Act unfair competition claims; to the extent that they may be different, the state law claim may require an additional element of bad faith or intent."); *see also Kraft*, 831 F.Supp. 123, 136 ("the Court has already found, in the context of the Lanham Act claims, that plaintiff has demonstrated a likelihood of confusion").

that any of these considerations is conclusive as a matter of law.

Given that those factors that plaintiff relies upon to establish consumer confusion are inconclusive, it is significant that plaintiff offers little in the way of empirical support for its claim. In fact, "[p]laintiff adduce[s] but one incident of actual confusion, and it is of scant probative value." *Brown,* 744 F.Supp. at 472. Specifically, plaintiff interprets NBC's decision to distribute copies of SAT in connection with a *Seinfeld* promotion as a clear indication that an average consumer could be misled as to the sponsorship of SAT. As plaintiff sees it, NBC's behavior suggests that the very network which airs *Seinfeld* mistook the book's origin. As defendants point out, however, the network's behavior might also be taken to suggest that NBC was not confused as to the origin of SAT so much as it was simply unconcerned with the origin of SAT.

Any inquiry into a defendant's alleged bad faith and the potential for consumer confusion necessarily entails a "factual inquiry." *Brown,* 744 F.Supp. at 467, 472. As such, summary judgment cannot be granted on plaintiffs claim of unfair competition unless there is no material dispute as to either of these matters. *Id.* at 472 ("Subjective issues such as good faith and intent are generally inappropriate subjects of summary judgment."); *see also Shaw,* 38 N.Y.2d 201, 379 N.Y.S.2d 390, 341 N.E.2d 817 (upholding denial of summary judgment where issue of material fact existed as to whether reasonably discriminating members of the public would be confused by publisher's advertising of bandleader's versions of musical compositions). Plaintiff certainly has not succeeded in eliminating any such dispute: "Similarity in overall appearance alone cannot establish source confusion as a matter of law. Nor is the addition of the anecdotal evidence. dispositive." *Coach,* 933 F.2d at 169. Defendants have fared no better; there are significant questions concerning the SAT cover, defendants' alleged bad faith during editing, and the adequacy of the book's disclaimer. In short, a dispute exists between the parties, a dispute which cannot now be resolved. Accordingly, the Court denies plaintiffs motion for summary judgment on its claim of unfair competition, as well as defendants' cross-motion on this same cause of action.

## CONCLUSION

For the reasons set forth above, the Court grants plaintiffs motion For summary judgment, on the issue of liability, on its claim of copyright infringement. As for plaintiffs common law claim of unfair competition, the Court finds that there remains a dispute as to material facts between the parties. Therefore, the Court denies plaintiffs request for summary judgment on this issue, as well as defendants' cross-motion for judgment in its favor.

A conference is scheduled for March 20, 1997, at 4:30 p.m., by which time the parties are directed to present the Court with a case management plan addressing how the measure of relief for the copyright infringement claim will be determined, and proposing a schedule for proceeding to trial on the claim of unfair competition.

**SO ORDERED.**